AO 106 (Rev. 04/10) Application for a Search Warrant

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

APR 0 8 2019

DOUGLAS F. YOUNG, Clerk
By

Deputy Clerk

In the Matter of the Search of )
)
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
The Premises Located at 611 Tamarind )
Street, Harrison, Arkansas )

Case No. 3:19 CM **13**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ **Western** _____ District of _____ **Arkansas** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution, Manufacture, Possession of Controlled Substances |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:
See Attached Affidavit of FBI TFO Robert Braden.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**FBI TFO Robert Braden**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___4/5/19___

City and state: **Fayetteville, Arkansas**

_____
*Judge's signature*

**Hon. Erin L. Wiedemann, US Magistrate Judge**
*Printed name and title*

## ATTACHMENT A

611 Tamarind Street, Harrison, Arkansas is a single story family dwelling with gray siding and a gray shingled roof. There is an attached garage with a single door. There is a black mailbox atop a wooden post with the number 611 affixed to the post next to the driveway.



## ATTACHMENT B

### ITEMS TO BE SEARCHED FOR AND SEIZED:

Articles of personal property tending to establish and document possession and/or distribution of controlled substances; or a conspiracy to do such; structuring or money laundering (financial transactions) designed to conceal or disguise the nature, location, source, ownership, or control of proceeds of a controlled substance, or to avoid a transaction reporting requirement; including but not limited to the following:

1. Controlled substances, buyer lists, seller lists, ledgers, financial records relating to the purchase, sale, manufacture or distribution of controlled substances, paraphernalia including but not limited to weight scales and packaging material.

2. Books, records, receipts, notes, bank statements and other bank records, money drafts, letters of credit, money orders, cashiers checks, and other monetary instruments, passbooks, bank checks, safe deposit box keys and records, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of proceeds from the sale of controlled substances; items providing evidence pertaining to structuring or money laundering, and documentation evidencing the expenditure of the proceeds of narcotics distribution to acquire assets, including, but not limited to, the purchase of vehicles, clothing, furniture, and electronic equipment.

3. Income tax returns, W-2 and W-4 forms, receipts, and other documents pertaining to the filing of personal and business tax returns.

4. United States currency and other financial instruments in amounts indicative of the proceeds of illegal drug trafficking.

5. Indicia of occupancy, residency, and/or ownership of real property including but not limited to utility and telephone bills, mortgage payment receipts and keys.

6. Papers, tickets, notes, schedules, receipts, and other items relating to domestic, international, and interstate travel.

7. Photographs, and/or video tape reproductions of co-conspirators, assets, or controlled substances.

8. Personal and business calendars, address and/or telephone books, rolodex indices, pager or cellular telephone memory, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, telex numbers, correspondences of the subjects of the investigation, and their criminal associates, sources of supply, customers, and financial institutions.

9. Weapons and counter-surveillance equipment that might be utilized in the conduct of illegal drug transactions.

10. Cellular Telephones, personal telephone books, telephone records, electronic memory chips, SIM cards utilized in cellular telephones, computers, tablet computing devices and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on cellular telephones, electronic memory chips, SIM cards, electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or

otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device. Agents are authorized to search computers, backup media and other digital media storage devices on the premises. If Agents cannot, for technical reasons or because of the volume of information, search on site, then Agents are authorized to make an image of hard drives or seize the computers, printers, backup digital media, hard disk drives or other devices capable of storing digital media and remove them to a laboratory setting to retrieve the listed information. Agents are authorized to seize any and all software, manuals, passwords, or any other instructions necessary to read, understand, or interpret the above-described information. Under Rule 41(f)(1)(B), Agents may retain a copy of that information for purposes of the investigation. The government proposes that the original storage media plus a full image copy of the seized media be retained by the government.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, FBI Task Force Officer Robert Braden, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is being submitted in support of an application for a search warrant for the premises, residence and vehicles located at 611 Tamarind St., Harrison, Arkansas, to include all improvements, residences, outbuildings, vehicles, and curtilage. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to search the subject property, it does not include all of the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant. The subject property and the items to be searched are described herein and in Attachment A, and the items to be seized are described herein and in Attachment B.

2.      I am the commander of the State of Arkansas 14th Judicial District Drug Task Force (14th JDDTF), and have been in this position since 2013. I have served the 14th JDDTF as commander and previously an investigator since 2001. I have been a certified law enforcement officer in the State of Arkansas since 1998. I have been a Task Force Officer for the FBI since 2015. As such, I am empowered to conduct investigations and make arrests for violations of the laws of the United States, including violations of 21 USC § 841(a)(1) and 846. In connection with my FBI and 14th JDDTF duties, I have received specialized training in the enforcement of state and federal narcotics laws. This training and experience has involved, among other things, (a) the debriefing of defendants,

1

witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, harboring, shielding, smuggling and employment of illegal aliens and of the laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; (d) conducting undercover operations; (e) preparing and executing state and federal search warrants and arrest warrants; (f) collecting information to further investigations; and (g) arresting individuals involved in drug trafficking violations. I also have experience in investigations involving the interception of wire communications. I am currently assigned to the Organized Crime Drug Enforcement Task Force (OCDETF). Based on this training and experience, I have become familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics dealers to import and distribute narcotics. I have also become familiar with their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking. I have been personally involved in several investigations involving the unlawful possession, manufacture, and distribution of controlled substances, including cocaine and methamphetamine as well as investigations involving money laundering offenses. I have also been personally involved in several drug trafficking organization investigations that included the interception of wire communications.

3. Regarding the business of illegal narcotics trafficking, I am also aware of the following things based upon my training and experience:

> **a.** That drug dealers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection by government or other law enforcement agencies.

2

**b**. That even though these assets are in other names, the drug dealers continue to use these assets and exercise dominion and control over them.

**c**. That drug dealers frequently maintain on-hand amounts of United States currency in order to maintain and finance their ongoing illegal drug business.

**d**. That drug dealers often maintain books, records, receipts, notes, ledgers, computers, computer disks, tickets, money orders, cashier's checks, wire transfer receipts, and similar drug related financial documents and records pertaining to the transportation, ordering, sale and distribution of illegal drugs. Furthermore, such documents are often written in code.

**e.** That drug dealers commonly front (provide illegal drugs on consignment) to their clients and often keep the aforementioned items so they can account for their drugs, the money owed for these drugs, and who has or owes for these drugs.

**f.** That the aforementioned books, records, receipts, notes, ledgers, tickets, money orders, cashier's checks, and similar financial documents and records, including computers, computer disks, diskettes, and hard drives, and other media are maintained where the drug dealers have ready access to them.

**g.** That it is common for drug dealers to conceal contraband, large amounts of currency, precious metals, jewelry, address lists, telephone lists, proceeds of drug sales, and records of drug transactions in secure locations within their residences, yards, garages, offices, businesses, automobiles, safes, safe

3

deposit boxes, and obscure locations known only to them, i.e., mail drops, mini storage warehouses, etc., for ready access and to conceal the same from law enforcement authorities.

**h.** That persons involved in illegal drug trafficking conceal in their residences, yards, offices, businesses, safes, garages, storage buildings, vehicles, safe deposit boxes, and obscure locations, caches of drugs, large amounts of currency, weapons, financial instruments, precious metals, jewelry, and other items of value and/or proceeds from drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of money made from engaging in illegal drug trafficking activities.

**i.** That drug dealers often purchase expensive vehicles, businesses and residences with the proceeds from their drug transactions. Also, that drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

**j.** That drug dealers amass large proceeds from the sale of illegal drugs, they often attempt to legitimize their profits and maintain evidence of financial transactions relating to the obtaining, transferring, secreting or spending of large sums of money derived from their illegal drug distribution activities.

**k.** That to accomplish these goals, drug dealers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts, telephones,

4

cellular telephones, facsimile machines, digital and various paging devices, and two-way radio systems. Furthermore, drug dealers frequently change telephone numbers, paging devices and telephone instruments.

**l.** That drug dealers commonly maintain addresses and telephone numbers in books or papers which reflect names, alias names, addresses, and telephone numbers for their associates in their illegal drug trafficking.

**m.** That drug dealers take or cause to be taken photographs, video and digital audiotapes of themselves, their associates, their property, and their illegal products. Furthermore, these drug dealers often maintain these photographs, video and audiotapes in their residences, offices, safes, garages, storage buildings, vehicles and safe deposit boxes.

**n.** That drug dealers frequently keep paraphernalia for packaging, diluting, weighing, and distributing the illegal drugs. Furthermore, this paraphernalia includes, but is not limited to, scales, plastic bags, diluting agents, boxes, trash compactors, heat sealers, and sealing tape.

**o.** That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, and in particular, illegal trafficking in controlled substances.

**p.** That drug traffickers very often possess firearms and other weapons for the purpose of protecting their drug trafficking enterprises from the efforts of law enforcement authorities as well as from persons who might attempt to steal any drugs or money possessed by the drug traffickers.

**q.** Affiant is aware that drug traffickers often maintain extra residences as

5

stash houses, meeting locations, and temporary housing for drug associates. Furthermore, these residences are frequently rented, purchased or titled in others names even though the residences remain in the control of the drug traffickers.

**r.** In the Affiant's experience as an investigator, it has been found that illegal drug trafficking is frequently a continuing activity over months and even years. Illegal drug traffickers typically will obtain and distribute controlled substances on a regular basis much as a distributor of a legitimate commodity would purchase stock for sale, and similarly, such drug traffickers will have an inventory which will fluctuate in size depending upon the demand for the product. The Affiant expects the drug trafficker to keep records of his illegal activities for a period extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which he might still be owed money, or might owe someone else money. Drug traffickers frequently use third parties to transport shipments of illegal drugs and cash proceeds from the sale of illegal drugs. These third parties use a variety of methods to transport shipments of illegal drugs and cash, including automobiles.

4.      I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of FBI and other law enforcement

officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent or law enforcement officer. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. In addition, this affidavit is based on information from the following sources:

a. Oral and written reports about this and other investigations which I have received from federal agents and local law enforcement;

b. Physical surveillance conducted by federal agents and task force officers (TFO), or local law enforcement agencies, the details of which have been reported to me either directly or indirectly;

c. A review of telephone toll records, and subscriber information; and cell phone location data obtained by Court order;

d. Public records;

e. A review of line sheets detailing intercepted telephone calls related to this investigation[1];

f. A review of audio recordings of intercepted telephone calls related to this investigation;

g. Information provided by reliable confidential sources of information and cooperating defendants; and

h. My training and experience as a Special Agent and the training and experience of other Special Agents of FBI and other law enforcement officials.

---

[1] In some locations, line sheets are quoted. These quotes are not intended to be taken as an exact quotation of the conversation between the parties, but do reflect for the reader to capture the essence of the conversation between the parties.

7

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that the subject property has been used and continues to be used to commit violations of 21 U.S.C.§ 841(a)(1), and 846.  There is also probable cause to believe that the items to be seized described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

6.     Your affiant further states that there is probable cause to believe that the items sought for seizure will lead to evidence of the aforementioned conspiracy to distribute controlled substances as well as the identification of individuals who are engaged in the commission of that crime and related crimes.

## PROBABLE CAUSE

7.     On January 7, 2019, the DEA was contacted by a confidential informant whose information has proven reliable through the study of telephone records, surveillance, and controlled pickups of money derived from sales of controlled substances.  The informant relayed to the DEA that a pickup of money derived from the sales of controlled substances was set to occur in Harrison, Arkansas in the parking lot for a restaurant between 11:00 am and 1:00 pm on January 9, 2019.  The informant relayed to investigators that the person dropping off the money derived from controlled substance sales did not know the identity of the person who would be picking up the funds; therefore, an undercover police officer could be utilized to make the pickup.

8.     To this end, on January 9, 2019, an undercover police officer contacted the telephone number provided by the informant and made arrangements to make the pickup

8

and deposit the money in a recorded telephone call. The undercover officer was provided a telephone number to call when he/she was at the location to pick up the funds.

9.     On January 9, 2019, at approximately 10:10 am, the undercover officer called the number provided and made arrangements with an unidentified, Spanish-speaking male to meet at approximately 11:00 am at the restaurant parking lot.

10.     At approximately 11:00 am, the undercover officer arrived at the restaurant parking lot. Several law enforcement personnel were in the area to conduct surveillance on the transaction. While waiting on the unidentified, Spanish-speaking male to arrive, the undercover officer entered the restaurant.

11.     At approximately 11:08 am, a Hispanic male arrived at the restaurant and also entered the restaurant. The Hispanic male was very large in stature, standing over 6 feet tall and weighing over 300 pounds. The Hispanic male entered the restaurant and began a conversation with the undercover officer. At approximately 11:14 am, both the Hispanic male and the undercover officer left the restaurant and went to the Hispanic male's vehicle, a red Hyundai Sonata registered to Jason Alvarez. There, the Hispanic male provided the undercover officer with a backpack.

12.     At approximately 11:15 am, both the undercover officer and the Hispanic male left the restaurant. The undercover officer rendezvoused with law enforcement, where the backpack was opened. The backpack contained $60,100.00 in United States currency, which was later deposited pursuant to the informant's instructions to learn more information regarding the money laundering methods of the larger drug trafficking/money laundering organization. This aspect of the investigation remains ongoing at this time.

13.     The Hispanic male was followed to a residence at 611 Tamarind St. in

Harrison, Arkansas. A utility check of the residence showed that the utilities in the home

were in the name of Jason Alvarez[2], the same as the registration for the vehicle driven by

the Hispanic male. A driver's license photograph of Jason Walter Alvarez was obtained,

which confirmed the identity of the Hispanic male from the money exchange as that of

Jason Walter Alvarez.

14.     Independent of the DEA's money laundering investigation into Jason

Alvarez and the larger DTO, over the course of the winter of 2018 and early 2019, the

FBI was conducting an investigation into the drug trafficking activities of Zachery

Manning. On February 19, 2019, the Hon. P.K. Holmes, III authorized the interception

of wire and electronic interceptions to and from the Manning telephone. Interceptions

began the same day at approximately 10:00 pm CST and continued until March 15, 2019

at approximately 4:00 pm, CST. During the Manning interceptions, it was established by

the FBI through that Manning was supplied with methamphetamine by a

individual named Daniel Perez-Lebron, who Manning referred to as "Puerto Rico."

Perez, in turn, worked as a drug trafficker for Jason Walter Alvarez.

15.     On February 20, 2019 at approximately 5:05 pm, the FBI intercepted a telephone

call between Manning and telephone number 951-710-4401, which is used by Daniel Perez-

Lebron, but subscribed to by Jason Alvarez. The relevant dialogue in the call is as follows:

Zach Manning (ZM):     Yeah – you got anything you working with?

---

[2] The investigation later revealed that another subject, Daniel Perez-Lebron, established water service at the 611
Tamarind St. address on February 11, 2019. The City of Harrison also reported that the previous resident of 611
Tamarind Street was target subject Jason Alvarez, who terminated water service on February 1, 2019 and provided a
forwarding address of 1260 Union Road, Harrison, Arkansas, the subject property here. As such, I believe that
approximately three weeks after the money exchange, Alvarez relocated to the subject property, but his
employee/co-conspirator, Daniel Perez-Lebron, moved into the Tamarind Street residence.

Perez (P):  Uhhhh... we try. I mean it's cooking so.

ZM:  Huh?

P:  Nothing, I'm not ready it's cooking so, I got nothing right now homie.

ZM:  How long?

P:  Uhh, I'm gonna say like, uh, three days.

ZM:  Are you kidding me?

P:  Un-uhh, like three days yeah.

ZM:  You gotta stop doing that, It's killing me.

P:  It's cooking, it's cooking.

Based upon my training, experience, and knowledge of this investigation, specifically

knowledge I will relay below, I believe this dialogue represents Perez telling Manning

that methamphetamine is being reconstituted from a liquid state to a solid state, which

Perez refers to as "cooking," noting it will take "three days."

      16.    In the evening of February 27, 2019, text message dialogue was intercepted

between Manning and Perez, which read:

PT:  U have all of it? (9:06 pm)

ZM:  How about u come see me I've been waiting I will have it all shortly (9:25 pm).

PT:  Ok I will come when u have all of it.  So txt me when u ready.  I'm not driving all the way for 100 u knw what I mean.  That's why I want to be sure u have all before I go (9:29 pm).

ZM:  How much? (9:30 pm)

PT:  1375  (9:46 pm).

ZM:  I got 400 (9:58 pm).

PT:  I see u tomorrow then I give u time to have more by then (10:00 pm).

ZM:  Hey look it's like this when u shut me down for week I gotta live somehow so dontnplay fucking games with me u n big boy been steadly makes g this so fucking hard I am about to have water shut off n I cant even work I ain't making

11

u loos eshit I was moving up had cash everytime paid bill everytime till u dick me around by leaving me drunk for two weeks (10:31 pm)

ZM:     Now either u wnt the money or u dont butni need work so I can feed my family (10:31 pm)

PT:     Hey look u still own me more then that and I fucking put money from my fucking pocket to help u out. So I can dick u around when ever I want but i was like that. And now I want 4075 the 2.700 u own the never paid. BB it's another shit I'm asking by my shiet so that's it's how gonna be. U have 3 weeks for have all of it... u better star working harder. Friendship it's one thing but BUSINESS it's another. (10:45 pm)

I believe this text message dialogue is regarding the debt for previously-provided methamphetamine that target subject Manning owes to the Alvarez DTO. Specifically, I believe that Manning owed a debt of $1375 to the Alvarez DTO which Perez is tasked by Alvarez with collecting. I believe based on the dialogue that Manning disputes this, and believes he is not being given a fair opportunity to pay his debt by the DTO, whom Manning refers to as "u and big boy," which is a reference to Perez and Alvarez. I believe the DTO will not provide Manning with methamphetamine, which he refers to as "work," until he has paid his debt. I finally believe that because Perez believes he has been dealt with by Manning with a lack of respect that he has raised the debt Manning owes from $1375 to $4075.

17.     The following day, I believe Manning apparently regretted his dialogue with Perez, as the following text message was intercepted from the Manning telephone to the Perez telephone on February 28, 2019 at 11:25 am: "Hey brother r u home so we can talk I apologize bought tripping last night." This text message prompted the following text message answer from the Perez telephone: "Damn bro u got me fucktop... all right we can talk but I'm not home now I'm gonna do some stuff whit BB" [sic]. I believe based on my knowledge of this case that Perez has agreed to meet with Manning, but not until later because he is with Alvarez, whom he refers to here as "BB," which I believe is

an abbreviation for "Big Boy." This further reinforces my belief that Alvarez and Perez are in an employer/employee relationship.

18.   Later that day, at approximately 5:47 pm, the Perez telephone sent the Manning telephone the following text message: "I'm be at home u can pass by when ever." I believe this to be an invitation by Perez to Manning for Manning to come to his home at 611 Tamarand St. in Harrison, Arkansas for a meeting.

19.   At 5:54 pm, a call was intercepted between Manning and Perez wherein Manning stated he was in route to Perez's home. Indeed, location data from the Manning telephone placed the Manning telephone in the area of 611 Tamarind Street in Harrison, Arkansas from approximately 6:00 pm through approximately 7:00 pm.

20.   Shortly thereafter, more text message dialogue referencing Manning's wish to receive more methamphetamine and Manning's debt to the DTO occurred. The text message dialogue between Manning and the Perez telephone was as follows:

ZM:   Now will u e able to give me some work or what (7:37 pm).

P:   He doesn't give me nothing I have nothing... (7:38 pm).

P:   He said u have to do all the paper work and then (7:44 pm).

ZM:   Got 700 (7:49 pm)

ZM:   Tell him to call me (7:52 pm).

P:   700 bring that. 563 left he said when u have it all he will give u more (7:54 pm).

I believe this dialogue represents Manning wishing to receive methamphetamine from the DTO, but Perez denying it until Manning has serviced his debt to the organization. I believe when Perez states "[h]e said u have to do all the paper work," Perez is saying that Alvarez, whom Perez refers to as "he," requires Manning pay his debt before

13

methamphetamine will be provided. In response, I believe Manning is stating that he has $700 to provide towards the debt and that Manning wants to talk to Alvarez personally instead of communicating further through Perez. Perez, in response, states that he has talked to Alvarez and that Manning needs to bring the $700, but will need to pay $563 more before Alvarez will allow Manning to have any more methamphetamine from the DTO.

21.     On March 2, 2019 at approximately 5:51 pm, a telephone call was intercepted on the Manning telephone between Manning and telephone 870-617-3838, which like the Perez telephone is also subscribed to by Jason Alvarez. Alvarez was later confirmed to be the actual user of 870-617-3838. The following represents the intercepted call in its entirety:

JA:     Rican said you have seven on you?

ZM:     Yeah.

JA:     Well your balance was 675, I don't know why he told you it was 1375.

ZM:     I don't either.

JA:     He fucked up but I got on his case for that.

ZM:     But it's straight, I mean, anyway

JA:     You busy right now?

ZM:     Uh, I mean not really but kind of, I'm headed back from Fayetteville.

JA:     Uh, you far?

ZM:     About 45 minutes out.

JA:     I see meet at my old house that's where Rican's at right now.

ZM:     Oh, OK.

14

JA:     I'll give you another 4 and you give me what you got.

ZM:     Alright

JA:     Wanna do that?

ZM:     Yeah that's straight

JA:     Alright cool. I'm gonna go to Rican's house gonna give him what he got.

ZM:     Alright

JA:     So lemme know or let him know you're coming by cause I'm gonna go see Him.

ZM:      Ok. That's straight

JA:     Alright.

ZM:     Bring the 675, huh

ZM:     Alright brother

JA:     Alright bye

ZM:     Later

Based on my training, experience, and knowledge of this investigation, I believe this dialogue represents "Tiny Big Boy" telling Manning that Perez, who Alvarez refers to as "Rican (short for Puerto Rico)," was incorrect about his (Manning's) balance owed, and in fact Manning owes $675. Further, I believe that when "Tiny Big Boy" states "I'll give you another 4 and you give me what you got" this means that if Manning provides Alvarez with $675, he will provide Manning with a quantity of methamphetamine, likely four (4) ounces. Furthermore, I believe when Alvarez states he is going to "go to Rican's house gonna give him what he got," that represents Alvarez stating that he is going to deliver methamphetamine to Perez at the 611 Tamarind Street house in Harrison, Arkansas for distribution by Perez.

15

22.     The meeting between Alvarez, Perez and Manning was not surveilled by law enforcement, nor was the location information for the Manning telephone accurate enough at the time to confirm with certainty that Manning visited Alvarez at Alvarez's home, Perez's home, or another location. The margin of error for the location data from the Manning telephone was approximately 5000 meters at the time, which could put Manning virtually anywhere in the city of Harrison, Arkansas. I do believe a meeting occurred, however, because throughout the evening into the late night hours of March 2, 2019, Manning sent and received numerous text messages and telephone calls to and from individuals known to be Manning's methamphetamine customers. The basis of each of these communications appeared to be that Manning now had methamphetamine available to sell.

23.     On March 7, 2019, a call was intercepted between Manning and Alvarez which contained the following dialogue:

JA:     I need you to cash out but...

ZM:     Huh?

JA:     I need you to cash out.

ZM:     Ok.

JA:     They're gonna come and get everything I have out here, they're going to come and pick up everything I have out here, they have to take it by Sunday.

ZM:     They're going to pick up everything you have out here?

JA:     Yeah all the cash thats done I need to pick it up thats what I'm saying.

ZM:     Ok well I'll get you some cash then. How much uh what what whats my total? Do you know? Off the top of your head? I think I do but ah.

JA:     It's 4 plus whatever...

16

ZM:   Yeah.

JA:   plus 375 so...

ZM:   Yeah

JA:   So it'll probably be around like 2.

ZM:   Ok

At approximately 8:27 pm, just after the above-quoted conversation ended, a text message from Alvarez to the Manning telephone was intercepted which read "2050 is the total," followed immediately by another text message from the Alvarez telephone which read "4 he gave you this last time and the 675 from the before." I believe that these communications indicate that Manning owes the Alvarez DTO $2050, which is for the four ounces of methamphetamine he received on March 2, 2019 and a carry-over balance of $675 dollars based on past methamphetamine debt. I further believe that Alvarez is seeking to collect the money, which he calls "cashing out," because he is due to pay his own suppliers of methamphetamine on or about Sunday, March 10, 2019. I believe this payment was to be made via a courier, this time unknown to the DEA's informant, much as occurred on January 9, 2019, described above.

24.   On March 13, 2019, Manning was arrested by the 14th Judicial District Drug Task force. Manning was traffic stopped by the Harrison Police Department for a vehicle equipment violation. A narcotics detecting canine was deployed on the vehicle in which Manning was traveling, which alerted for the presence of narcotics. The vehicle was searched, and Manning was found to be in possession of a firearm and approximately a quarter of an ounce of suspected methamphetamine, which was packaged in a manner consistent with resale.

25. At the Boone County Jail, Manning was interviewed by local investigators after being advised of his Miranda warnings. Manning told investigators about a large source of methamphetamine in the area named "Jason" whom everyone calls "Big Boy"; however, Manning refused to provide any more detail regarding the identity of "Jason." Manning stated that "Jason" would receive methamphetamine and "clean" it using acetone, resulting in approximately 100 pounds of methamphetamine per shipment. I believe this likely means that "Jason," who I believe to be Jason Alvarez, will receive methamphetamine in a liquid form and convert it to a solid form. Manning stated that this "cleaning" process would occur at a location he only knew to be in and around Alpena, Arkansas. Manning either could not or would not provide a more specific location. Manning stated that while much of the methamphetamine would be sold locally, some of it would be shipped out of state for sale elsewhere. Manning also stated that "Puerto Rico" was an employee of "Jason" whom would conduct drug trafficking activities for "Jason" and participate in the methamphetamine "cleaning" process. Manning, although he stated he knew the actual name for "Puerto Rico," declined to provide it to investigators. Manning did, however, identify the 611 Tamarind Street home in Harrison, Arkansas as the residence for "Puerto Rico." Manning noted that "Puerto Rico" had recently moved into the residence, and previously "Jason" had lived in the residence. Manning remains incarcerated in the Boone County Jail, facing charges from the State of Arkansas at this time.

26. The FBI has previously obtained search warrants to locate both the Alvarez telephone[3] and the Perez telephone.[4] Data from the Alvarez telephone and the Perez telephone indicated that on or about March 11, 2019, both telephones, therefore presumably both Alvarez and Perez,

---

[3] WDAR case no. 3:19 CM 10.
[4] WDAR case no. 3:19 CM 7.

traveled to Des Moines, Iowa, where they spent a considerable amount of time at a hotel until the evening hours of March 12, 2019. At approximately 6:00 pm on March 12, 2018, the target telephone and the Perez telephone both traveled back to the Harrison, Arkansas area, arriving at approximately 2:00 am on March 13, 2019. Both telephones remained in the Harrison area until March 16, 2019, when they again both traveled north, once again to Des Moines, Iowa, where they stayed for less than 24 hours, then returned to the Harrison area on March 17, 2019. Based on my training, experience, and knowledge of this and similar investigations, I find this pattern of travel to be suspicious especially in the context of the intercepted communications quoted herein and believe the travel is likely related to the trafficking of methamphetamine, the remittance of money for past methamphetamine sales, or a combination thereof.

27. The Alvarez telephone provides the FBI with location data which is consistently within a margin of error of less than 10 feet, allowing investigators to virtually pinpoint the location of the Alvarez telephone, and therefore presumably locate Alvarez. On March 17, 2019, at 2:05 am when Alvarez returned from Des Moines, Iowa, he went to a rural property near Alpena, Arkansas, the exact address of which is 15220 US 412, Alpena, Arkansas (hereafter, 'Alpena property'). The location data for the Alvarez telephone puts the telephone at the 15220 US 412, Alpena, Arkansas address at approximately 2:05 am. A public land records search for the Alpena property revealed that the Alpena property is owned by Walter Alvarez, which open-source research demonstrates is Jason Alvarez's father. For the reasons which follow, the FBI learned that the Alpena property is utilized by Alvarez and Perez to reconstitute liquid methamphetamine into solid methamphetamine, which is then sold in the Western District of Arkansas and beyond.

28. On March 31, 2019, the location data for the Alvarez telephone indicated that Alvarez

was once again located in Des Moines, Iowa.  Once again, Alvarez stayed in Des Moines for

less than 24 hours, traveling back to the Harrison, Arkansas area and arriving on April 1,

2019 at approximately 10:20 pm at the 611 Tamarind ST. residence where Perez now resides.

29. Previously, On March 28, 2019, the Hon. P.K. Holmes, III, authorized wire and electronic

interceptions to and from the telephone utilized by Jason Alvarez.  Interceptions began at

approximately 10:30 pm on April 1, 2019.  At approximately 11:18 pm, a call was

intercepted between Alvarez and an unknown user of 657-286-9920 (UNK9920).  The

following dialogue occurred:

| | |
|---|---|
| UNK9920: | Hey, I was going to tell you that [unintelligible] gets there on Wednesday or Thursday. |
| JA: | On Thursday? |
| UNK9920: | Yeah, around that day. |
| JA: | Okay, that's fine.  Uhm, if [unintelligible] after midnight, I'll let you know. |

Later in the conversation:

| | |
|---|---|
| UNK9920: | Is the guy from Huntsville there? |
| JA: | No, not until the weekend. |
| UNK9920: | Oh. Yeah, today is Monday it takes 2-3 days. |
| JA: | Mhm (affirmative response), I'll let you know. |

Based on my training, experience, and knowledge of this investigation, I believe that this

represents UNK9920 telling Alvarez that someone will be at his location to either pick up

money, or deliver methamphetamine, or both, by Thursday, April 4, 2019.

19.    On Tuesday, April 2, 2019, at 3:07 pm, a text message was intercepted from Perez to

20

Alvarez. The text message read "at ur dad's house." Approximately two hours later, at 5:20 pm, the location of the Alvarez telephone indicated that it had arrived at the Alpena property, where it stayed until approximately 10:20 pm. I believe based on the intercepted text message from Perez and the location of the Alvarez telephone that Perez and Alvarez were likely at the Alpena property, which is owned by Jason Alvarez's father Walter.

20.     On Wednesday, April 3, 2019, several things occurred which relate to the investigation. First, at approximately 1:20 pm, Alvarez met with two individuals in a rental vehicle bearing Illinois license plates. This meeting occurred at the restaurant parking lot where Alvarez had previously met with the undercover officer in January, as noted above. Investigators conducting surveillance watched one of the individuals who arrived in the rental vehicle reached into Alvarez's vehicle as if retrieving something. Based on my training, experience, and knowledge of this investigation, I believe this meeting likely represents the meeting Alvarez discussed with UNK9920 discussed above. I believe the purpose of this meeting was for Alvarez to remit money for past methamphetamine sales for laundering or as payment.

21. Investigators conducting surveillance at 1:55 pm observed Alvarez go to a hardware store in Harrison, Arkansas, where he met Perez. The hardware store also sells firearms. Inside, investigators observed as Perez purchased a 9mm firearm and several firearm accessories. Alvarez purchased approximately 500 rounds of 9mm ammunition. Perez and Alvarez left the hardware store in separate vehicles, but both drove to another parking lot, where Perez placed the firearm into Alvarez's vehicle. An interview with the hardware store employee who sold the firearm revealed that Perez and Alvarez have purchased several firearms over the last several weeks.

22. The location data from the Perez telephone indicated that later in the day on April 3,

2019, Perez was located in the area of the Alpena property. Specifically, from 4:32 pm to 9:17 pm, the Perez telephone gave location data which was consistent with Perez being on the Alpena property.

23. A call was intercepted at approximately 7:20 pm between Perez andAlvarez. In this call, the following dialogue occurred:

Perez: Do you want me to go now?

Alvarez:     No, when you're coming, once you're done.

Perez: Okay, are you coming over?

Alvarez:     No.

Perez: So what do I do with that, do I leave it outside?

Alvarez:     What?

Perez: What you send me to drain and cover.

Alvarez:     Aha. If you want leave it draining all night. Tomorrow, I'll get There and we will take them out, clean them, and package them.

Perez: Well, I've been draining them for awhile since I got here.

Alvarez:     Oh, you already took them out. Okay, if you want...

Perez: One of them, mhm, looks like [UI] small and the other one looks like a cookie. They are soft. Once I took them out they had juice on the top. The juice was coming out of the top so it was good.

Alvarez:     Okay, but there's not of enough juice to make meat. There's too little.

Perez:     There's a lot.

Alvarez:     Really?

Perez:     Yes, the soup. I have half the pot is full of soup. [Laughter.]

Alvarez:     Okay, well leave it like that for now. If you want clean what's outside already and if a lot of dust comes in or something really

22

|         |                                                                          |
|---------|--------------------------------------------------------------------------|
|         | small just throw it back in to the soup. And as you're cleaning it if you some small things so you can add it. Do you understand me? |
| Perez:  | Yes.                                                                     |
| Alvarez:| Yeah.                                                                    |
| Perez:  | [UI]                                                                     |
| Alvarez:| Just clean the piece. Hello?                                            |
| Perez:  | I'm going to clean it there, [UI].                                      |
| Alvarez:| Did he cut everything already or what?                                 |
| Perez:  | No, he still has some left.                                             |
| Alvarez:| No, if he already cut everything?                                      |
| Perez:  | He's still working on that.                                             |

Based on my training, experience, and knowledge of this investigation, it is my belief that this call represents Perez working on reducing liquid methamphetamine back into a solid for retail sale. I know from my training and experience that to reconstitute liquid methamphetamine back into a solid, a solvent chemical such as acetone is utilized. The solvent is combined with the liquid methamphetamine, which in simple terms causes the liquid to evaporate, leaving the solid crystalline methamphetamine. In order to conduct this reconstitution, the conditions need to be as warm and dry as possible. While reconstitution is possible in lower temperatures and when moisture is present, it can take a longer time and be a slower process. Knowing this, when Perez states "Once I took them out they had juice on the top. The juice was coming out of the top so it was good," I believe this means that Perez has checked on the progress of the reconstitution and the reconstitution process is in progress. Furthermore, I believe when they speak of "cutting," they are speaking of adulterating the methamphetamine in order to yield a greater amount of methamphetamine to sell.

24. On Thursday, April 4, 2019, at approximately 5:52 pm, a call was intercepted between Perez and Alvarez at approximately 5:48 pm. In the call, the following dialogue occurs:

| | |
|---|---|
| Alvarez: | You didn't go up today, right? |
| Perez: | No. |
| Alvarez: | Oh, okay. |
| Perez: | I was going to go up, but didn't. |
| Alvarez: | No, that's fine. [UI] |
| Perez: | Everything is how it was. Right now, everything-- |
| Alvarez: | Mhm, that's fine. [Audio breaks.] Hello? Oh, it's raining. |
| Perez: | Yeah, it's raining. |
| Alvarez: | Yeah, it's fucking stupid. It didn't rain all day until now. |
| Perez: | Mhm. |

Based on my training and experience, I believe in this dialogue when Alvarez asks, "you didn't go up today," he is asking Perez if he has been to the Alpena property to check on the reconstitution process. I further believe they spoke about the rain and humidity because of the process humid weather can have on the reconstitution process, as noted above.

25. On April 5, 2019, at approximately 7:00 am, the Hon. Erin L. Wiedemann, United States Magistrate Judge for the Western District of Arkansas authorized a search warrant to search the Alpena property. The warrant was executed at approximately 2:00 pm. Inside the residence at the Alpena property, FBI investigators located approximately 100 pounds of a substance which field tested positive for methamphetamine which was packaged in heat-sealed bags of approximately 1 kilogram each. In addition, investigators located another quantity of methamphetamine which was currently in transition from a liquid to a solid. Nobody was

24

present at the residence upon the execution of the search warrant. This seizure confirmed to investigators that Jason Alvarez and Daniel Perez-Lebron are indeed involved in a conspiracy to distribute methamphetamine in the Western District of Arkansas.

26. I believe the Alpena property/residence was used as a location to reconstitute methamphetamine and store methamphetamine in bulk for the drug trafficking organization before its sale. The subject property, by contrast, is the residence of Daniel Perez-Lebron. I know that Daniel Perez-Lebron is the resident of the subject property because he activated the utilities for the subject property on February 11, 2019. I also know that Perez resides at the subject property because of surveillance which has been done on the property and because the FBI has utilized a pole camera to observe the subject property at all times of the day and night since March 11, 2019. Finally, location data from the Perez telephone places Perez at the subject property on a regular basis, including at night when he would likely be sleeping. Indeed, as recently as April 5, 2019, FBI investigators have observed Perez through conventional and electronic surveillance at the subject property. As such, and based upon the discovery of a large amount of methamphetamine at the Alpena residence, I believe the subject property will contain further evidence of Alvarez and Perez's drug trafficking activities.

## JUSTIFICATION FOR A "NO KNOCK" SEARCH WARRANT

27. I assert that a search warrant which is executable without the "knock and announce" requirement is necessary to protect the safety of the officers executing the warrant, safety to the public, and to prevent the destruction of evidence. This is because, on April 3, 2019, as noted above, Alvarez and Perez purchased a firearm, approximately 500 rounds of ammunition, and the gun sales person noted to investigators that they had purchased several firearms in the last

several weeks. While firearms were located at the Alpena residence, no 9mm firearms were located. Therefore, I believe it likely that the occupants of the subject property will be armed.

28. Based on the foregoing, your affiant asserts that there is probable cause to believe that evidence of a Conspiracy to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a) and 846 will be maintained in properties described in Attachment A. Thus, Affiant prays that a search warrant for the subject property will issue which dispenses with the "knock and announce" requirement for safety reasons.

FBI Task Force Officer Robert Braden

Sworn before me on this ___5th___ day of April, 2019.

HON. Erin L. Wiedemann
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF ARKANSAS

26